UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Peter A. Morris

  v.         Civil No. 11-cv-248-JL
              Opinion No. 2012 DNH 175
Michael J. Astrue, Commissioner,
Social Security Administration


**MEMORANDUM ORDER**

This is an appeal from the denial of Peter Morris's
application for Social Security benefits.  See 42 U.S.C.
§ 405(g).  An administrative law judge ("ALJ") found that Morris
was disabled within the meaning of the Social Security Act from
December 27, 1983 through January 1, 2001, and awarded him
benefits for that period.  The ALJ also found, however, that
Morris's condition had improved as of January 2, 2001, such that
he was capable of performing substantial gainful activity
beginning that date, see 20 C.F.R. §§ 404.1594(f), and
accordingly denied Morris benefits after that date.

Morris has moved for an order reversing that decision, see
L.R. 9.1(b)(1), arguing that the ALJ's conclusion that his
condition had improved was not supported by substantial evidence,
insofar as the ALJ failed to assign appropriate weight to certain
evidence and relied upon a defective hypothetical posed to the
vocational expert who testified.  The Commissioner of the Social
Security Administration ("SSA") has cross-moved for an order

affirming that decision, see L.R. 9.1(d), arguing to the
contrary.  This court has subject-matter jurisdiction under 42
U.S.C. § 405(g) (Social Security).  After reviewing the
administrative record, the parties' joint statement of material
facts, and their respective memoranda, the court concludes that
the ALJ improperly discounted the opinion of Morris's treating
physician.  The court accordingly grants Morris's motion and
denies the Commissioner's motion.

**I.    <u>Applicable legal standard</u>**

        This court's review under § 405(g) is "limited to
determining whether the ALJ deployed the proper legal standards
and found facts upon the proper quantum of evidence."  Nguyen v.
Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The ALJ is responsible
for determining issues of credibility, resolving conflicting
evidence, and drawing inferences from the evidence in the record.
See Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218,
222 (1st Cir. 1981).  If the ALJ's factual findings are supported
by substantial evidence in the record, i.e., "such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion," Richardson v. Perales, 402 U.S. 389, 401 (1971)
(quotations omitted), they are conclusive, even if the court does
not agree with the ALJ's decision and other evidence supports a
contrary conclusion.  See 42 U.S.C. § 405(g); Tsarelka v. Sec'y

of Health & Human Servs., 842 F.2d 529, 535 (1st Cir. 1988).  The
ALJ's findings are not conclusive, however, if they were "derived
by ignoring evidence, misapplying the law, or judging matters
entrusted to experts."  Nguyen, 172 F.3d at 35.

## II.  **Background**

Pursuant to this court's local rules, the parties filed a
Joint Statement of Material Facts (document no. 16), which is
part of the record reviewed by the court.  See LR 9.1(d).  This
court will briefly recount the key facts and otherwise
incorporates the parties' joint statement by reference.

In August and September 2009, Morris, who was 47 years old
at the time, filed applications for disability insurance
benefits, including adult disabled child benefits, and
supplemental security income.  Admin. R. at 174-89.  Morris's
applications claimed that he had been disabled since December 27,
1983.  Id. at 176.  The SSA initially denied Morris's
applications on February 25, 2010, id. at 104-15, and Morris
requested a hearing before an ALJ, see generally 20 C.F.R.
§ 405.301 et seq.

The ALJ held a hearing on December 6, 2010.  Prior to the
hearing, Morris submitted a number of medical records pre- and
postdating the alleged onset of his disability, and Morris's
father submitted a function report relating his observations of

Morris's day-to-day activities and abilities. See Admin. R. 283-91. At the hearing, Morris testified about his work history and his day-to-day activities (as did his father), as well as the symptoms of his condition. A vocational expert engaged by the SSA also appeared and testified at the hearing.

The evidence showed that Morris had suffered from anxiety and depression beginning at a young age. Id. at 398-400, 402-04, 410. At the age of 16, he was diagnosed with "a tremendous amount of anxiety which weakens his ability to concentrate and his short term memory," as well as "his abstracting ability, and ability to understand verbal communications." Id. at 399. His judgment in social situations was poor, and his "ability to use insight or to form a trusting relationship" was adjudged to be "quite limited." Id.

Despite these difficulties, Morris completed his GED in 1979. Id. at 223. His work history is somewhat limited. Morris worked full-time as a maintenance assistant for a rubber company for less than a year in the early 1980's, and full-time as a tool crib attendant for the Wentworth Institute of Technology for about two and a half years before that. Id. at 20, 31-33, 220, 225-28, 249-52. In both positions, Morris worked alongside his father. Id. at 20, 31-33. At the administrative hearing, Morris's father testified that Morris did poorly in both jobs.

4

With regard to Morris's job as a tool crib attendant, Morris's father testified that Morris "had trouble understanding or getting along or whatever," and recalled one occasion on which Morris disappeared and was found sitting on the floor in a corner, "all hunkered up."  Id. at 32.  And with regard to Morris's job as a maintenance assistant, Morris's father testified that "with the number of people that were there, it bothered [Morris] going from one machine to another to do some minor repair on a hydraulic line or something like that.  He, he didn't like it."  Id. at 33.

In 1983, Morris was arrested and stopped working.  Id. at 23.  He remained incarcerated for the next 24 years, and was released in April 2007.  Id. at 12, 17, 219, 224.  While incarcerated, Morris worked for an unknown period of time in the facility's learning center and kitchen.  Id. at 18, 502-03; see also id. at 378 ("The claimant states that while he was incarcerated he worked mostly in janitorial jobs.").  Though Morris has applied for jobs since being released, he has not worked since his release, due partially to his criminal record.  Id. at 18, 224.

The administrative record is devoid of any medical records from the date of Morris's initial incarceration until 1997.  In December 1997, Morris underwent a mental health evaluation that

revealed no evidence of a mood disorder.  Id. at 357-61.  The treating social worker determined that no clinical follow-up was necessary, and advised Morris to contact mental health services "as needed."  Id. at 358.

At some point in 1998, Morris was diagnosed with depression and prescribed Nortriptyline to treat its symptoms.  Id. at 362.  In early 1999, Morris discontinued the use of Nortriptylene and began using Zoloft instead.  Id. at 485.  Although Morris continued to be diagnosed with a dysthymic disorder after beginning these medications, his depression was markedly decreased or eliminated.  In late 1999, he reported suffering "very little" or no depression, id. at 363-65, and his medical records for the ensuing years repeatedly refer to his depression as "in remission," see, e.g., id. at 329-30, 368-69, and his condition as "at baseline," see, e.g., id. at 331-33, 498-504.

Following his release, Morris attended a single outpatient group therapy session in July 2007, but was a "no show" for later sessions, id. at 513, though he did attend a 30 minute counseling session with Bruce Latham, DO in August 2007, see id. at 524.  In October 2007, Virginia Rockhill, PhD, completed a comprehensive psychiatric profile of Morris, apparently in connection with an earlier application for benefits.  See id. at 376-79 (repeatedly referring to Morris as "the claimant").  Dr. Rockhill noted that

Morris suffered from chronic depressive symptoms including sadness, feelings of worthlessness, social isolation, hopelessness, and amotivation, as well as some social anxiety with others.  Id. at 378.  She also noted that Morris's "social functioning appears to be appropriate and effective with his family" but that it was "difficult for him to interact with people he does not know."  Id. at 378-79.  She adjudged that Morris was "able to remember and follow instructions as well as perform simple complex and varied tasks," but that he would "become[] anxious when he is working with others" and experience "difficulties with concentration."  Id. at 379.  Based upon her evaluation, Dr. Rockhill diagnosed Morris with dysthymic disorder[1] and antisocial personality disorder.[2]  Id.

A mere two months later, Dr. Rockhill again conducted a psychiatric evaluation of Morris (again, apparently in connection with an application for benefits).  See id. at 576-79.  Much of

---

[1]Dysthymic disorder consists of "chronically depressed mood that occurs for most of the day more days than not for at least 2 years."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 376 (4th ed., text revision 2001) ("DSM-IV").

[2]Antisocial personality disorder is demonstrated by "a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood," DSM-IV 701; "deceit and manipulation are central features" of the disorder, which is also referred to as psychopathy, sociopathy, or dyssocial personality disorder. Id. at 702.

the information related in Dr. Rockhill's evaluation echoed that in her earlier evaluation.  She noted, however, that Morris experienced extreme functional loss in social interactions, such that he could not be around others.  <u>Id.</u> at 578.  She further noted that Morris experienced frequent functional loss in work-related task performance, and continual functional loss due to work-related stress.  <u>Id.</u>  Though Morris was able to "initiate a task," he could not multi-task, and being around people created stress for him.  <u>Id.</u>

Based upon this evaluation, Dr. Rockhill altered her diagnosis, concluding that Morris suffered from major depression[3] and posttraumatic stress disorder.[4]  <u>Id.</u> at 579.  She recommended that Morris attempt to manage these maladies with medication and cognitive therapy, but noted that due to a lack of income or health insurance, he was unable to afford treatment.  <u>Id.</u>  Dr.

---

[3]Major depressive disorder is characterized by "one or more Major Depressive Episodes . . . without a history of Manic, Mixed, or Hypomanic Episodes."  <u>DSM-IV</u> 369.  "The essential feature of a Major Depressive Episode is a period of at least 2 weeks during which there is either depressed mood or the loss of interest or pleasure in nearly all activities."  <u>Id.</u> at 349.

[4]"The essential feature of posttraumatic stress disorder is the development of characteristic symptoms following exposure to an extreme traumatic stressor . . . . The characteristic symptoms resulting from the exposure to the extreme trauma include persistent reexperiencing of the traumatic event . . . , persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness . . . , and persistent symptoms of increased arousal . . . ."  <u>DSM-IV</u> 463.

Rockhill also opined that Morris's general level of functioning
following treatment would be "moderately limited," but estimated
that it would take "greater than 4 years" for him to return to
work.  Id.

Between Dr. Rockhill's evaluations, Michael Schneider, PhD
performed a mental residual functional capacity assessment of
Morris.  Dr. Schneider opined that Morris was moderately limited
in his abilities to (a) understand and remember detailed
instructions; (b) work in coordination with or proximity to
others without being distracted; (c) interact appropriately with
the general public; (d) accept instructions and respond
appropriately to criticism from supervisors; and (e) respond
appropriately to changes in his work setting.  Id. at 303-04.
Dr. Schneider further opined that Morris did "have a severe
impairment," but continued:

> Despite [Morris's] impairment, he retains the ability
> to understand, remember and carry out short and simple
> instructions without special supervision.  He is able
> to maintain adequate attention for these kinds of
> instructions and complete a normal work week.  In an
> environment where he is in a somewhat socially isolated
> workstation and where supervisory criticism is not
> overly critical of his performance, and where he does
> not have to interact with the general public, he is
> able to interact appropriately with peers and
> supervisors.  Under those conditions, he is able to
> accommodate to changes in a work setting.

Id. at 305.  Dr. Schneider diagnosed Morris with dysthymic
disorder and "[i]nflexible and maladaptive personality traits

9

which cause either significant impairment in social or
occupational functioning or subjective distress." Id. at 310,
314.  As a result of these conditions, Dr. Schneider opined that
Morris experienced moderate difficulties in maintaining social
functioning and concentration, persistence, or pace.  Id. at 317.

Morris visited the Indian Stream Clinic in February and
March of 2008.  Id. at 382-86.  The clinic diagnosed Morris with
major depression, but noted at the time that Morris was taking
Zoloft daily and that his depression was stable.  Id.  Morris
also visited Bruce Latham, DO somewhat regularly in 2008 and
2009.  Although Dr. Latham twice noted that Morris was apparently
suffering from depression, see id. at 521, 523, depression was
not mentioned in Dr. Latham's notes from the bulk of these
visits, see id. at 518-20, 522.  In October 2009, Dr. Latham
authored a letter noting Morris's "history of not interacting
appropriately with others socially over any period of time" due
to his depression.  Id. at 516.  Dr. Latham noted that although
Morris was on medication for depression and anxiety, he still
suffered "frequent outbreaks."  Id.  Dr. Latham closed the letter
by opining that Morris "would have difficulty in a work
environment where he had to work with others or had a supervisor
over him."  Id.

Dr. Rockhill completed another psychiatric profile of Morris in November 2009.  Id. at 538-43.  She noted that Morris "appears to have a very good understanding of his activities of daily living and I would say at this time other than having some difficulties shopping or going to public areas, he has some limitations but generally functions well."  Id. at 540.  She opined that Morris's "ability to function is limited but it is not precluded."  Id. at 540-41.  She noted, however, that

> Mr. Morris' reactions to stress and adaptation to work or work-like situations appear to be quite severe.  He cannot handle long-term work commitments due to his panic attacks and is unable to tolerate stressors in the workplace nor is he able to interact appropriately with peers or supervisors.  He would likely be able to maintain a schedule but would likely find it difficult to maintain attendance, especially if his work situation required him to be around other people.

Id. at 541.  Dr. Rockhill again diagnosed Morris with dysthymic disorder and posttraumatic stress disorder, as well as avoidant personality disorder.[5]  Id. at 542.  She opined that if Morris were to engage in treatment, "it is unlikely that he would make enough progress even over the course of several years to attenuate his significant anxiety."  Id.

In January 2010, J. Coyle, PhD conducted a psychiatric review of Morris in connection with Morris's present applications

---

[5]Avoidant personality disorder is characterized by "a pervasive pattern of social inhibition, feelings of inadequacy, and hypersensitivity to negative evaluation . . . ."  DSM-IV 718.

11

for benefits.  See id. at 544-75.  Dr. Coyle noted a number of
"[i]nflexible and maladaptive personality traits," including (1)
"[s]eclusiveness or autistic thinking"; (2) "[p]athologically
inappropriate suspiciousness or hostility"; (3) "[p]ersistent
disturbances of mood or affect"; (4) "[p]athological dependence,
passivity, or aggressivity"; and (5) "[i]ntense and unstable
interpersonal relationships and impulsive and damaging behavior."
Id. at 551.  Dr. Coyle opined that due to these traits, Morris
had suffered marked limitations in his activities of daily living
and maintaining his social functioning and concentration,
persistence, or pace during the period from 1983 through 2001.
Id. at 554.

Dr. Coyle further opined, however, that Morris's "mental
status and associated functional capacities had improved and were
no longer markedly limited by 2001."[6]  Id. at 556.  Though he
diagnosed Morris as continuing to suffer from dysthymic disorder,
id. at 561, Dr. Coyle found that as a result of this improvement,
Morris experienced only mild restrictions in his activities of
daily living and moderate difficulty in maintaining his social
functioning and concentration, persistence, or pace, id. at 568.
Dr. Coyle then completed a mental residual functional capacity

---

[6]Dr. Coyle also noted a possibility that Morris's mental
health "improved earlier than 2001, but records prior to this
time are not currently available for review."  Admin. R. at 556.

assessment for Morris, concluding that Morris was moderately limited in a number of areas, to wit, the abilities to:

- carry out detailed instructions;

- maintain attention and concentration for extended periods;

- perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

- work in coordination with or proximity to others without being distracted by them;

- complete a normal workday and workweek;

- interact appropriately with general public;

- accept instructions and respond appropriately to criticism from supervisors;

- get along with coworkers;

- maintain socially appropriate behavior;

- respond appropriately to changes in work setting; and

- set realistic goals or make plans independently of others.

Id. at 572-73.  Dr. Coyle concluded that Morris was otherwise not significantly limited in his abilities.  Id.

Dr. Latham completed a competing residual functional capacity assessment of Morris in December 2010.  Id. at 581-85. In Dr. Latham's assessment, Morris experienced marked limitation in a number of areas, including the abilities to:

- maintain attention and concentration;

- work in coordination with or proximity to others without being distracted by them;

13

- complete a normal workday and workweek without interruptions and to perform at a consistent pace;

- interact appropriately with the general public;

- accept instructions and respond appropriately to criticism from supervisors;

- get along with coworkers;

- maintain socially appropriate behavior; and

- respond appropriately to changes in work setting.

Id. Dr. Latham also concluded that Morris was moderately limited in a number of areas, including the abilities to:

- understand, remember, and carry out detailed instructions;

- perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

- sustain an ordinary routine without special supervision;

- make simple work-related decisions;

- ask simple questions or request assistance; and

- set realistic goals or make plans independently of others.

Id. This description of limitations, Dr. Latham noted, had been true throughout Morris's lifetime, and was likely to be permanent. Id. at 585.

At the hearing before the ALJ, Morris testified that he was still taking Zoloft to treat his depression. Id. at 24. Though the Zoloft "tends to take the edge off a little bit," Morris testified, "it's still there," just "not as acute." Id. He also testified that other than this medication, "the occasional visit

14

with Dr. Rockhill," and a visit with Dr. Latham "every three months," he was not receiving mental health treatment.  Id. at 21-22.

Morris expressed skepticism about his ability to maintain a job.  He speculated that he would try to keep a job "as long as possible," but "if there's going to be somebody there constantly telling me, well, you've missed a spot or you need to do this again and this, this or, I'd just get confused and I'd probably end up quitting."  Id. at 19.  He thought that he "wouldn't do real good in a job situation where I had to work with others," because he is "extremely nervous" around new people.  Id. at 22. In such situations, Morris testified, he wants to "go someplace safe. . . . If somebody says something or whatnot, I give them a sarcastic jab to get them away from me.  And if all of that fails, I just stop going to work."  Id. at 22-23, see also id. at 25.  Morris's father (with whom Morris resides) corroborated this testimony, stating that Morris "would remove himself from any situation that required working with others."  Id. at 288. Morris's father further testified that when Morris is around people he doesn't know, he acts as "though they're not there, non-existent."  Id. at 30.  When visitors come to the house, Morris will greet them and "asks how do you do, shakes hands and

so forth," but "just as soon as he can, he'll go upstairs to his room."  Id.

Morris also testified to nervousness in unfamiliar places, stating that "if I'm able to, I just get up and leave the area. Either that, or I go find a corner to hide in."  Id. at 24.  He testified that when he goes out in public, he usually does so with a family member, and in stores, "I try to avoid contact with anybody.  I pay for the groceries and then leave."  Id. at 25. Morris's father testified, however, that Morris is "friendly with the clerks at the store when we go to the grocery store," id. at 29-30, and also submitted a function report stating that Morris talks by phone with others with whom he was incarcerated about once a week, id. at 287.

Morris further testified that during the day, he typically does "[o]dd jobs around the house."  Id. at 25.  According to his father, Morris does chores for four to eight hours daily, including yard work, property repairs, electrical work, and plumbing, as well as more mundane tasks including cleaning, laundry, taking out the trash, and preparing dinner.  Id. at 284- 85.  For recreation, Morris plays computer games and cards, and walks around the property.  Id.  He takes his meals in his room, and generally does not go out to eat because it's not a "comfortable situation"; the last time he went out he "got really

nervous and kept asking if we could leave." Id. at 25-26; see also id. at 29 (testimony of George Morris).  Despite his nervousness, Morris enjoys "taking care of dogs and cats." Id. at 25; see also id. at 297 ("He would spend 24 hrs a day taking care of the cats if he didn't have other things to do.").  He takes care of eight cats and five dogs at home, and volunteers at a local dog kennel for half days two to three days per week.  Id. at 27.  At the kennel, he doesn't work with people other than his supervisor, and never has to be around people who are coming to adopt a pet.  Id.  Nonetheless, Morris is friendly with his supervisor at the kennel.  Id. at 29.

The ALJ later issued a written decision finding that Morris suffers from a personality disorder, dysthymic disorder, and an anxiety disorder.  Id. at 76.  The ALJ further found Morris's personality disorder severe enough from December 27, 1983 to January 1, 2001, to render him disabled as defined by the Social Security Act.  Id. at 76-77.  The ALJ found, however, that this disability ended as of January 2, 2001, due to medical improvement.  Id. at 77.  In reaching this determination, the ALJ relied in principal part upon the residual functional capacity assessment performed by Dr. Coyle, which the ALJ found to be consistent with Morris's activities of daily living.  Id. at 79-81.  The ALJ gave "little weight" to the assessment performed by

17

Dr. Latham, and "moderate weight" to Dr. Rockhill's opinion.  Id.
at 80.  The ALJ also gave "little weight" to the New Hampshire
Department of Health and Human Services's determination that
Morris was eligible for Aid to the Permanently and Totally
Disabled.  Id. at 81.

The ALJ's decision was selected for review by the Decision
Review Board ("DRB").  See 20 C.F.R. § 405.401 et seq.  The DRB,
however, failed to complete its review during 90-day period
allotted by 20 C.F.R. § 405.420(a)(2), making the ALJ's decision
the final decision of the SSA.  Admin. R. at 1.  Morris filed
this appeal on May 16, 2011.

## III. **Analysis**

A five-step process is used to evaluate an application for
social security benefits.  20 C.F.R. §§ 404.1520(a)(4),
416.920(a)(4).  The claimant bears the burden, through the first
four steps, of proving that he is disabled, i.e., that (1) he is
not engaged in substantial gainful activity; (2) he has a severe
impairment; (3) the impairment meets or equals a specific
impairment listed in the Social Security regulations; and (4) the
impairment prevents or prevented him from performing past
relevant work.  Id.; see Freeman v. Barnhart, 274 F.3d 606, 608
(1st Cir. 2001).  At the fifth step, the SSA bears the burden of
showing that the claimant has the residual functional capacity to

perform other work that may exist in the national economy. Freeman, 274 F.3d at 608; see 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  "[A]ll five steps are not applied to every applicant, as the determination may be concluded at any step along the process."  Freeman, 274 F.3d at 608.

In the present case, the ALJ concluded that as of January 2, 2001, Morris's impairments had improved to the point where they no longer met or medically equaled the impairments listed in the Social Security regulations.  Admin. R. at 77.  Morris challenges that conclusion, arguing that the ALJ erred in (a) not according "full weight" to the findings of Virginia Rockhill, Ph.D., who evaluated Morris on several occasions, and Bruce Latham, D.O., Morris's treating physician; (b) failing to account for the minimizing effects of his confinement on his disorders; and (c) not according any weight to the New Hampshire Department of Health and Human Services's ("DHHS") determination that Morris is disabled and eligible for Aid to the Permanently and Totally Disabled ("APTD").  After careful review of the record and the parties' submissions, the court rejects the majority of these assignments of error.  The ALJ discounted Dr. Latham's opinion, however, for improper reasons.  The court therefore reverses the ALJ's decision and remands the case for further proceedings before the ALJ.

19

## A.    Drs. Rockhill's and Latham's findings

Morris first argues that the ALJ erred in not according "full weight" to the opinions of Drs. Rockhill and Latham.  He argues that "the ALJ glossed over the fact that Dr. Rockhill evaluated Mr. Morris three times over roughly two years," failed to note the "extensive limitations" set forth in Dr. Rockhill's December 2007 and November 2009 reports, and improperly discounted Dr. Rockhill's opinion based upon Morris's own testimony about his daily and weekly activities.  Morris further argues that the ALJ, instead of giving Dr. Latham's residual functional capacity assessment little weight because its basis was not clear, should have made further inquiry of Dr. Latham. The court agrees that the ALJ gave insufficient reasons for discounting Dr. Latham's opinion, and that this error warrants remand.  Morris's other assignments of error, however, do not.

The court considers the ALJ's dismissal of Dr. Latham's assessment first.  As detailed above, Dr. Latham opined that Morris experienced marked limitation in a great number of abilities, and moderate limitation in several others, as a result of his depression and anxiety.  See Admin. R. at 581-85.  In her order, the ALJ assigned "little weight" to Dr. Latham's opinion, stating that "[t]here is no indication that Dr. Latham was aware

of the definitions for these ratings and he did not provide any diagnosis to go along with this opinion." Id. at 80.

The ALJ's statement that Dr. Latham "did not provide any diagnosis" with his opinion is plainly incorrect, as the Commissioner concedes. In his treatment records--which the ALJ actually cited in her order, see id.--Dr. Latham repeatedly diagnosed Morris with depression. See, e.g., id. at 523-24. Insofar as the ALJ's order suggests that this was her reason for assigning so little weight to the opinion of Dr. Latham, Morris's treating physician, this alone warrants remand. See, e.g., Mushero v. Astrue, 384 Fed. Appx. 693, 695 n.1 (10th Cir. 2010) ("[T]he ALJ should ensure that any reasons for discounting the treating psychiatrist's opinion are supported in the record."); Mills v. Astrue, 226 Fed. Appx. 926, 932 (11th Cir. 2007) (if ALJ does not give treating doctor's opinion substantial weight, "he must show good cause by articulating reasons that are supported by the evidence").

The ALJ's other reason for discounting Dr. Latham's opinion, that there was "no indication" that he "was aware of the definitions" of various ratings, is also inadequate. The ALJ was correct that the record contains no such indication. But it also contains no indication that Dr. Latham was not aware of those definitions. In an evidentiary vacuum such as this, the ALJ

21

could not simply draw the conclusion that Dr. Latham did not know
of or understand what the various ratings meant.[7]  If the ALJ
believed that Dr. Latham's awareness of the definitions of the
ratings was material to the credibility of his assessment, it was
incumbent upon her to further develop the record.

As the Court of Appeals has explained, "[b]ecause Social
Security proceedings are not adversarial in nature, the [SSA has]
a duty to develop an adequate record from which a reasonable
conclusion can be drawn." Heggarty v. Sullivan, 947 F.2d 990,
997 (1st Cir. 1991) (internal citation and quotation marks
omitted).  "This duty to develop the record is heightened where
the claimant is not represented by counsel, but applies in all
cases." Brunel v. Barnhart, No. 00-cv-402, 2002 WL 24311, *8
(D.N.H. Jan. 7, 2002) (citing 20 C.F.R. § 404.1512(d)).  The duty
is also heightened "if there is a gap in the record and the ALJ
could have filled in that gap without undue effort." Price v.
Astrue, 2008 DNH 164, 13-14 (citing Currier v. Sec'y of Health,
Educ. & Welfare, 612 F.2d 594, 598 (1st Cir. 1980)).  "If the ALJ
fails to fill those evidentiary gaps, and if they prejudice

---

[7]Notably, the record contains no indication that state
agency psychiatric consultant J. Coyle, PhD "was aware of the
definitions" of the ratings for the residual functional capacity
assessment he performed of Morris, but the ALJ did not draw any
negative conclusion regarding Dr. Coyle's knowledge of those
definitions (or lack thereof).

plaintiff's claim, remand is appropriate." Mandziej v. Chater, 944 F. Supp. 121, 130 (D.N.H. 1996).

This gap in the evidence may well have prejudiced Morris's claim. "Prejudice is demonstrated by showing that the additional evidence might have led to a different decision." Alker v. Astrue, 2011 DNH 075, 12 (citation and internal quotations omitted). Here, the evidentiary gap caused the ALJ to discount the opinion of Morris's treating physician. Had the ALJ given full weight to that opinion, she might have accepted Dr. Latham's assessment of Morris's functional limitations rather than the comparatively less severe assessment of Dr. Coyle. And had she done so, she may well have arrived at a different conclusion regarding Morris's disability. Closing that gap, moreover, would not have been particularly difficult; it would have entailed no more than a simple inquiry to Dr. Latham. Remand is necessary so that inquiry can be made.[8]

The ALJ did not err, however, in her conclusions as to Dr. Rockhill's opinions. That the ALJ "glossed over the fact that Dr. Rockhill evaluated Mr. Morris three times over roughly two years" has no relevance. The ALJ expressly cited each of those

---

[8]Because the court is remanding for further consideration of Dr. Latham's opinion, it does not address Morris's argument that the court's hypothetical question to the vocational expert who testified at the hearing was improper because it failed to take Dr. Latham's opinion into account.

opinions in her order, see Admin. R. at 79-81; "[a]n ALJ is not required to expressly refer to each document in the record, piece-by-piece." Rodriguez v. Sec'y of HHS, 915 F.2d 1557, 1990 WL 152336, *1 (1st Cir. 1990). The ALJ was also warranted in rejecting the limitations set forth in Dr. Rockhill's various reports, insofar as those limitations were inconsistent with Morris's own testimony about his daily and weekly activities. See, e.g., Forrester v. Comm'r of Soc. Sec., 455 Fed. Appx. 899, 902 (11th Cir. 2012) ("[T]he ALJ did not need to give a treating physician's opinion considerable weight if evidence of the claimant's daily activities contradicted the opinion."); Ellis v. Comm'r of Soc. Sec., 59 Fed. Appx 114, 115-16 (6th Cir. 2003) (ALJ "may reject the opinion of a treating physician" if contradicted by the claimant's own testimony).

### B.   The ALJ's consideration of Morris's incarceration

Morris also argues that the ALJ erred in failing to take into account the minimizing effect his confinement might have had on the symptoms of his disorders in 2001, the date his condition supposedly improved. Morris points out that the SSA's listings caution about the "[e]ffects of structured settings," and note:

> Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure. . . . Such

> settings may greatly reduce the mental demands placed on
> [a person].  With lowered mental demands, overt symptoms
> and signs of the underlying mental disorder may be
> minimized.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F).  Because of this

effect, the listing cautions that the ALJ "must consider [the

claimant's] ability to function outside of such highly structured

settings."  Id.

The court has no doubt that a prison environment can provide

the type of highly structured setting described in the listings.

See, e.g., Clester v. Comm'r of Soc. Sec., No. 09-cv-765, 2010 WL

3463090, *7 (Aug. 3, 2010) ("[I]mprisonment also imposes a highly

structured setting with little interaction with a limited set of

individuals, a highly controlled schedule, and incentives for

'good' behavior.  It imposes little or nothing comparable to the

performance demands that are imposed in daily life, much less in

a competitive work setting.").  The ALJ did not fail to consider

Morris's ability to function outside of this setting, though.  To

the contrary, the ALJ fully considered Morris's medical records

postdating his release, as well as Morris's activities of daily

living after his release, in concluding that Morris's condition

had improved to a point where he was no longer disabled.  See

Admin. R. at 79-81.

In light of the necessity of remand to the ALJ for the

reasons already discussed, a lengthy exposition of the evidence

supporting the ALJ's conclusion may be largely academic.  Insofar
as a brief discussion might be useful to the ALJ and the parties
on remand, however, the court provides one here.  Among other
things, the ALJ noted that Dr. Rockhill appraised Morris's
ability to function after his release as "limited, but not
precluded," and that both she and Dr. Latham had described
Morris's abilities to perform work-related tasks without simple
limitations.  Id. at 79.  The ALJ further noted that after his
release, Morris indicated an ability "to deal with his mood
disorder with the help of medication," id., and took part in a
variety of activities around the house, including cooking,
cleaning, managing his finances, driving, shopping, laundering,
e-mailing with former inmates, caring for animals, and doing odd
jobs around the house, id. at 80.  In addition, the ALJ remarked,
Morris volunteered at a local animal shelter and was friendly
with clerks at stores.  Id. at 80-81.

     All this evidence supports the ALJ's conclusion that Morris
was able to achieve the same level of functionality outside the
prison's "highly structured setting" as during his incarceration.
To the extent there is conflicting evidence in the administrative
record, it was well within the ALJ's province to discount that
evidence in favor of the evidence just recited.  See Rodriguez,
647 F.2d at 222 (resolution of conflicts in the evidence is a

question for the ALJ, not the reviewing district or appellate
court).  Similarly, to the extent that Morris argues that his
medical records from the period of his incarceration support a
finding of disability, the record contains more than adequate
evidence from that period to support the ALJ's conclusion that
Morris's condition improved over the course of his incarceration
such that he was no longer disabled.  As recited in the ALJ's
decision, and as summarized above, <u>see</u> <u>supra</u> Part II, Morris's
medical records indicate that he complained of depression at one
point while incarcerated, but that depression later subsided with
treatment and was repeatedly characterized as "in remission" from
the early 2000's until the date of his release.[9]

### C.   DHHS's determination of APTD eligibility

Morris finally argues that the ALJ erred in "not putting any
weight on" the DHHS's determination that Morris was eligible to
receive APTD benefits.  The ALJ concluded that this opinion was
entitled to "little weight," noting that "[a] determination by
another government agency that a claimant is disabled is not
binding on the Commissioner."  Admin. R. at 81 (citing 20 C.F.R.
§§ 404.1504, 416.904).  The ALJ further noted that it was

_____

[9]Morris also argues that "[t]here is no evidence that [he]
would have been able to work during his continued confinement."
As previously noted, however, Morris in fact had various jobs
during his time in prison.  <u>See</u> Admin. R. at 18, 378, 502-03.

"unclear" what evidence the DHHS relied upon in making this determination, and that "[i]n the absence of this information," DHHS's opinion was entitled to "little weight."  Id.

Morris concedes that the ALJ was not bound to accept the DHHS's determination of disability.  He argues, however, that "evidence of a disability determination by another governmental or nongovernmental agency cannot be ignored and must be considered."  Social Security Ruling 06-03p, Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, 2006 WL 2329939, at *6 (S.S.A. 2006).  That is not what occurred here, however; the ALJ did not ignore DHHS's decision. The ALJ considered that decision in the context of the entire record, and concluded that in context, that decision was not entitled to substantial weight.  For this reason, Bickford v. Barnhart, 242 F. Supp. 2d 39 (D. Me. 2002), upon which Morris relies, is unhelpful to him.  There, the court remanded to the ALJ specifically because the ALJ's opinion did "not mention the Veterans Administration [decision as to disability] at all."  Id. at 42 (emphasis added).

Morris also argues that the ALJ erred in noting that the factual underpinnings of DHHS's decision were "unclear,"

asserting that "[t]he Psychiatric Evaluation solicited by the
DHHS . . . is part of the administrative record and is referenced
extensively in the careful analysis and determination of the
DHHS."  Although that evaluation is indeed a part of the
administrative record, it is hardly true that it is "referenced
extensively" in DHHS's analysis.  To be sure, the evaluation is
<u>quoted</u> extensively in that analysis.  But it is not referenced a
single time.  Indeed, had Morris's brief not communicated the
relationship between the two documents, this court itself would
not have appreciated it, and the ALJ certainly did not err in
failing to do so without any such guidance.[10]  In any event, on
remand, Morris can make that relationship clear to the ALJ.

IV.  <u>Conclusion</u>

Pursuant to sentence four of 42 U.S.C. § 405(g), Morris's
motion to reverse and remand the Commissioner's decision[11] is
GRANTED.  The Commissioner's motion to affirm the decision[12] is

---

[10]Even if the ALJ should have perceived that relationship,
moreover, it is difficult to see how this oversight could
possibly have affected the ALJ's analysis, when the ALJ expressly
took the evaluation upon which the DHHS's determination relied
into account in her opinion.  <u>See</u> Admin. R. at 80-81 (citing Exh.
15F).

[11]Document no. 12.

[12]Document no. 15.

29

DENIED.  The Clerk of Court is directed to enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: September 27, 2012

cc:  Ruth Dorothea Heintz, Esq.
     Gretchen Leah Witt, Esq.
     T. David Plourde, Esq.